IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

ROTOWORKS INTERNATIONAL LIMITED                          PLAINTIFF

        v.              Civil No. 07-5009

GRASSWORKS USA, LLC;
GRASSWORKS!!! L.L.C.;
ROBERT D. UMBERSON a/k/a/BOBBY
UMBERSON; and LINDA K. REED                              DEFENDANTS

                    O R D E R

    On the 21st day of February, 2007, came on for hearing
plaintiff's **Motion For Preliminary Injunction** (document #3), and
upon consideration of that motion, the response thereto, the
evidence adduced at the hearing, the arguments of counsel, and the
post-hearing briefs, the Court finds and orders as follows:

    1.  Plaintiff alleges trademark infringement by
counterfeiting and implied passing off, in violation of **15 U.S.C.
§1114(1)**, and trade dress and trademark infringement under **15
U.S.C. §1125(a)**.  It seeks, preliminarily, an injunction which
would prevent defendants from making or selling equipment which
imitates its products; prevent them from selling genuine Rotowiper
products they currently have in stock; prevent them from any
marketing activities using plaintiff's trademark or trade dress;
prevent them from selling or otherwise disposing of their own line
of equipment until plaintiff has had a chance to inspect it during
discovery; and prevent them from disposing of documentary evidence
relevant to this dispute.

2.   The Court finds the following to be the facts relevant to the dispute:

*   Plaintiff Rotoworks International Limited ("Rotoworks"), a New Zealand corporation, produces a line of agricultural implements which are generically described as "weed wipers."  Weed wipers are essentially rollers on wheels, designed to roll across pasture or crops wiping herbicide on undesirable plants while sparing the desirable ones, by virtue of the differing height of the plants.

*   Since at least 1998, Rotoworks has used the trademark "Rotowiper" for its weed wipers.  It has obtained United States trademark protection for the mark "ROTOWIPER."  Due to the passage of time, that trademark has become incontestable.  It has obtained similar protection for the mark in New Zealand, Australia, the United Kingdom, the European Community, and France.

*   Rotoworks painted its Rotowipers aqua,[1] and applied to them a logo which consisted of a small red box depicting plants being rolled over by a circular object.

*   During the time period relevant to this case, Rotowipers were distributed in the United States exclusively by

---

[1]There was evidence that a few - very few - Rotowipers were painted red, but the number appears to be extremely small, insufficient to undermine the effect built up over years of painting almost all machines aqua.

-2-

individual defendant Bobby Umberson ("Umberson") and an entity commonly referred to as GrassWorks.  The correct name of this entity is a matter of confusion.  Umberson - one of its principals - was unable to clearly explain the distinction between GrassWorks USA, LLC; GrassWorks!!! LLC; and GrassWorks.  The Court has found nothing in the evidence to clarify this situation, and will, therefore, treat all the "GrassWorks defendants" as name variations on the same entity until sufficient proof is adduced to distinguish them.

* There was no written contract setting forth the parameters of the manufacturer/distributor relationship between Rotoworks and Umberson/GrassWorks, but it was understood by all concerned that Umberson/GrassWorks would be the only United States distributor of Rotowipers.

* Umberson and GrassWorks used internet websites, printed sales brochures, advertisements in trade magazines, and display booths at trade shows to market Rotowipers. Pictures - and examples - of Rotowipers, as well as the Rotowiper trademark name and red logo, were prominently displayed in all these marketing materials.

* In late Summer or early Fall, 2004, without authorization from or notice to Rotoworks, Umberson and

GrassWorks began fabricating weed wipers at a shop in Lincoln, Arkansas. While there were minor differences, the design of these weed wipers was essentially the same as that of the Rotowiper. The Arkansas-made weed wipers were painted the same aqua color as Rotowipers. Defendants did not utilize the red logo, or put the name Rotowiper on their units, but instead attached a small label that stated the units were "manufactured exclusively for GrassWorks USA, Inc. LLC."

* At about the same time, defendant Linda Reed ("Reed" became the Marketing Director for GrassWorks.

* Umberson and Reed began to tout their Arkansas-made weed wipers to the customers they obtained via the channels already established and used to market Rotowipers. They did not tell customers that they sold two brands of weed wipers, both Rotowipers and GrassWorks Weed Wipers. Instead, they purported to sell only Rotowipers, some made in New Zealand and some made in Arkansas. In some instances Umberson or Reed would indicate that the models made in Arkansas were stronger, had better tires, and had larger tanks allowing longer use before refilling. In some they would state that the Arkansas-made units were built to the same specifications as the New Zealand units. It appears that there was no price

-4-

differential.

* In November, 2006, Rotoworks got wind that the defendants were making and selling competing weed wipers, and immediately retained a private investigator, Steve Mankin ("Mankin"), to look into the matter.

* Mankin visited the Rotowiper booth at the Tulsa Farm Show on December 9, 2006, posing as a horse farmer interested in purchasing a weed wiper to upgrade his pasture. A Rotowiper was on display. Umberson extolled the virtues of Rotowipers to Mankin. He told Mankin that he imported some Rotowipers from New Zealand, and manufactured some in Arkansas, building them to the same specifications and paying Rotoworks a royalty.

* Mankin later located the GrassWorks manufacturing facility near Lincoln, Arkansas, and via telephone placed an order for a 12' Rotowiper with Reed. When Mankin received written confirmation of his order, it stated that he had ordered a "12' pull type GrassWorks Weed Wiper."

* On January 15, 2007, Umberson called Mankin and offered to deliver his unit. In the telephone conversation, Umberson asked Mankin if he wanted a New Zealand-made unit or an Arkansas-made unit. Mankin said he was not

particular, but wanted a 12' Rotowiper, and he wanted one that would last.  Umberson told Mankin that the Arkansas-made unit had a larger tank, stronger pumps, and frames, and would last longer and outperform the New Zealand unit.  He did not, however, indicate that the Arkansas-made unit was not a Rotowiper.  Umberson attempted to deliver an Arkansas-made unit, but Mankin did not accept the delivery, instead having Umberson served with process in this lawsuit.

* Potential buyers of weed wipers found GrassWorks, Umberson, and Reed exclusively through their Rotoworks marketing materials.  These materials contained no references to an Arkansas-made weed wiper, or a GrassWorks Weed Wiper.[2]  There were no separate marketing materials for an Arkansas-made weed wiper or a GrassWorks weed wiper, nor were the Arkansas-made units marked with a plate identifying them as "GrassWorks Weed Wiper."  Instead, the decal on the Arkansas models stated that they were "manufactured exclusively for GrassWorks USA, Inc. LLC."

* When a customer wanted to place an order, Umberson and Reed did not ask whether he wanted a genuine Rotowiper

---

[2]One document (a two-sided sheet identified as W1 and W2) does mention the GrassWorks Wiper one time, but it mentions Rotowiper or rotowiper.com a total of seven times.  The context is such that a reader would undoubtedly understand the single reference to GrassWorks Wiper as being a Rotowiper.

or an Arkansas-made knock-off.  Instead, they would ask questions about the planned usage of the equipment, such as the number of acres to be treated or what size tank the customer wanted.  Based on the responses, they would then conclude that the customer preferred an Arkansas-made weed wiper rather than a genuine Rotowiper.  Umberson described this technique as "allowing the customer to notice the difference" between the Arkansas-made weed wipers and the genuine Rotowipers.  This deceptive marketing tactic allowed Umberson and Reed to take advantage of the Rotowiper trademark, marketing efforts, name recognition, and reputation, to sell a different product.

* Umberson testified that if he were enjoined from selling both Rotowipers and Arkansas-made weed wipers painted aqua, he would anticipate a loss in the range of $750,000.00 for 2007.  Reed testified that such a loss was a "possibility."  This testimony is not credible.  Umberson testified that he purchased only one container of Rotowipers a year, that a container held 48 units, and that he had 55 units on hand as of the date of the hearing.  It thus appears that the sale of Arkansas-made weed wipers had completely displaced the sale of genuine Rotowipers by 2006. As for aqua-painted units, Umberson

testified that he was not "selling on color," and had begun painting his Arkansas-made units yellow about two weeks before the hearing.

* Umberson gave a variety of explanations for why he decided to paint the Arkansas-made weed wipers aqua. His testimony on this issue is not credible. He testified that he chose aqua because he had the paint on hand to touch up Rotowipers damaged in shipment; because it provided good coverage without using much paint; because it did not clash with the colors of other farm equipment; and because it did not show blemishes, rust, or manure. These asserted reasons fly in the face of common sense. The quantity of paint on hand for touch-ups would clearly be insufficient to paint the number of Arkansas-made units that were being produced. Rust and manure would not show up less against an aqua background than against other colors. Aqua does not offer less "clash" with common farm implement colors than other colors.

* Umberson also testified that aqua paint is cheaper than yellow paint, but his testimony about the size of the price differential was contradicted by that of Rafe Essary, a witness with a background in auto body work. While there does appear to be a differential, the

-8-

credible evidence indicates that it is minimal.

3.   In order to establish its right to preliminary injunctive relief, Rotoworks must satisfy the four factors set out in **Dataphase Systems, Inc. v. CL Systems, Inc.**, **640 F.2d 109 (8th Cir. 1981)**:

* Is there a threat of irreparable harm to Rotoworks?

* What is the balance between harm to Rotoworks if injunctive relief is not granted, and harm to the defendants if it is granted?

* What is the probability that Rotoworks will succeed on the merits?

* What is the public interest in this matter?

4.   **The Threat of Irreparable Harm**:

For the reasons set forth in paragraph 6, the Court finds that the conduct of defendants had a tendency to deceive customers who wished to purchase a Rotowiper.  That being the case, irreparable harm to Rotoworks is presumed. "A finding of tendency to deceive satisfies the requisite of irreparable harm." **Black Hills Jewelry Mfg. v. Gold Rush, Inc.**, **633 F.2d 746, 753 (8th Cir. 1980)**.  This factor weighs in favor of Rotoworks.

5.   **The Balance of Harms**:

Against the presumed irreparable harm to Rotoworks if an injunction is not granted the Court has only the testimony of Umberson and Reed that their business might suffer a loss of as

-9-

much as $750,000.00 in 2007 if it is enjoined from selling Rotowipers and Arkansas-made weed wipers painted aqua. The Court finds this testimony incredible. The evidence suggests that defendants' sales of Rotowipers had come to a virtual standstill as a result of their practice of substituting their own products. Indeed, judging from the numbers given by Umberson, it appears that no Rotowipers were sold in 2006. As for aqua-painted Arkansas-made weed wipers, Umberson testified that he was not "selling on color," and has already begun painting his units yellow. The Court thus finds there will be very little, if any, harm to defendants if they are enjoined from selling Rotowipers and aqua-painted Arkansas-made weed wipers. This factor weighs in favor of Rotoworks.

6.   **The Probability of Success on the Merits**:

(a)   The "implied passing off" claim:

The Lanham Act "prohibits the use of a mark in connection with goods or services in a manner that is likely to cause confusion as to the source or sponsorship of the goods or services." **Davis v. Walt Disney Co.**, **430 F.3d 901 (8th Cir. 2005)**; **15 U.S.C. §1125(a)(1)**. This includes confusion "as to whether there is an 'affiliation, connection, or association' with another person." **Id.** "[T]he core element of trademark infringement law is whether an alleged trademark infringer's use of a mark creates a likelihood that the consuming public will be confused as

-10-

to who makes what product." **Id.** (internal citations and quotation marks omitted).

In evaluating the likelihood of confusion from the use defendants made of the mark "Rotowiper," six factors are to be considered:

* the strength of the mark for Rotoworks, which has a right to its protection because it is a registered, incontestable mark;

* the similarity between Rotowork's and defendant's marks;

* the degree to which the goods compete;

* whether defendants intended to confuse the public;

* the type of product, its costs and conditions of purchase; and

* evidence of actual confusion in the marketplace.

**Frosty Treats Inc. v. Sony Computer Entertainment America Inc.**, **426 F.3d 1001 (8th Cir. 2005).** The Court evaluates these factors as follows:

* The "Rotowiper" mark was a strong one for Rotoworks. It was registered in the United States, and also in New Zealand, Australia, the United Kingdom, the European Community, and France. Rotoworks has used the mark since at least 1998.

* The "similarity" factor does not come into play in this case, inasmuch as the gravamen of the claim is that defendants were profiting from deceptive use of Rotoworks' trademark rather

-11-

than using one confusingly similar.  In that respect, this case is akin to **Truck Equipment Service Company v. Fruehauf Corporation**, **536 F.2d 1210 (8th Cir. 1976)**, where the defendant used photographs of plaintiff's product to trade upon plaintiff's reputation and to "confuse potential customers as to the source of origin of the trailer pictured on the sales literature."

&ast;     The goods in question were in direct competition.

&ast;     There is strong evidence that defendants intended to confuse the public as to the distinction between their Arkansas-made weed wipers and genuine Rotowipers, including Umberson's statements to Mankin at the Tulsa Farm Show, the sales tactics described by Reed, and the close similarity in appearance between the Rotowipers and the Arkansas-made weed wipers.

&ast;     The type of product, its costs, and conditions of purchase are also factors which weigh in favor of Rotoworks.  The product is a farm implement for which there is no established showroom, no widely circulated catalog.  A sample of the product, along with one-page brochures and video clips, is taken to farm shows, where potential customers can look it over.  They may place orders there, or over the telephone or internet.  The product is delivered to them later, when they may have lost or discarded the sales literature.  If an Arkansas-made machine is delivered, it will be virtually identical in appearance to the machine the customer viewed at a show, or the machine in the sales brochure.

The tag on the Arkansas-made weed wipers reflects that the machine was "mfg exclusively for GrassWorks USA, Inc. LLC," which would not necessarily disabuse a purchaser of the notion that the machine was a Rotowiper manufactured exclusively for GrassWorks.

* While there was no evidence of actual confusion, the Court does not find this to weigh heavily in favor of defendants, under the peculiar circumstances of this case. Defendants' customers are Americans, and defendants were the only American distributor of the product. Thus any complaints would have been fielded by Umberson or Reed, and the chance that they would ever reach Rotoworks appears minuscule. The issue, however, is not actual confusion, but likelihood of confusion, a finding which "must ultimately rest on the inference to be drawn from circumstantial evidence." **Heartland Bank v. Heartland Home Finance, Inc.**, **335 F.3d 810, 822 (8th Cir. 2003)** (citation omitted). An inference of confusion may certainly be drawn from the sales tactics of the defendants.

The foregoing evaluation of factors leads the Court to conclude that Rotoworks has shown a strong likelihood of prevailing on its Lanham Act claim of implied passing off.

(b) The trade dress infringement claim:

Rotoworks claims that its aqua paint color is protectible trade dress that has been infringed by defendants' act of painting

-13-

their virtually identical product the same color.[3]  Defendants
counter that color is not a protectible aspect of trade dress.

Trade dress is "the total image of a product, the overall
impression created, not the individual features."  To establish a
claim for infringement thereof, Rotoworks must prove:

(1)  that its trade dress is inherently distinctive, or has
acquired distinctiveness through secondary meaning;

(2)  that it is nonfunctional; and

(3)  that its imitation would result in the likelihood of
confusion in consumers' minds as to the source of the
product.

**Gateway, Inc. v. Companion Products, Inc.**, 384 F.3d 503 (8th Cir.
2004).

The Court finds that a sufficient showing of secondary
meaning has been made to justify injunctive relief on this theory.
There was evidence that no other brand of farm machinery is
painted aqua, and that Rotoworks has used the color almost
exclusively for its Rotowipers since it began operations.  This
date is not shown by the evidence, but the American trademark
registration was obtained in 1998, so the implements have been
made for at least eight years.

In addition, "[t]he existence of secondary meaning of a mark

---

[3]Rotoworks also contends that the doctrine of licensee estoppel prevents defendants
from contesting the protectibility of the aqua color, but has cited no cases of licensee
estoppel involving trade dress.  The Court does not find it necessary to address this
argument, given that the decision turns on other points of law.

may be inferred from evidence of deliberate copying of that mark," **Aromatique, Inc. v. Gold Seal, Inc.**, 28 F.3d 863, 871 (8th Cir. 1994). Here, the evidence strongly suggests that defendants chose to paint their competing weed wipers aqua because that was the color of genuine Rotowipers, lending strength to Rotoworks' claim of secondary meaning for its paint color.

The Court also finds that the aqua color is non-functional as that concept is understood in trademark jurisprudence. Trade dress is functional if it performs some function other than identifying the product.

> If the particular feature is an important ingredient in the commercial success of the product, the interests in free competition permits its imitation in the absence of a patent or copyright. On the other hand, where the feature or, more aptly, design, is a mere arbitrary embellishment, a form of dress for the goods primarily adopted for purposes of identification and individuality and, hence, unrelated to basic consumer demands in connection with the product, imitation may be forbidden where the requisite showing of secondary meaning is made. Under such circumstances, since effective competition may be undertaken without imitation, the law grants protection.

**Gateway**, 384 F.3d at 508, citing in part the **Fruehauf** case.

The Supreme Court has explained functionality thus:

> [i]n general terms, a product feature is functional, and cannot serve as a trademark, if it is essential to the use or purpose of the article or if it affects the cost or quality of the article, that is, if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage.

**Qualitex Co. v. Jacobson Products Co.**, 514 U.S. 159, 165 (1995).

Although Umberson gave a litany of reasons for using the aqua

color, none of those reasons persuades the Court that the color was functional.  While aqua may be a cheaper color than the yellow defendants have now started painting their weed wipers, the difference is minimal, and certainly not such as to put defendants at a "significant non-reputation-related disadvantage."

As for the likelihood of confusion in consumers' minds as to the source of the product, the Court has already explained that the evidence is strong that this is the very reason defendants chose to paint their weed wipers aqua.

For the foregoing reasons, the Court finds a likelihood that Rotoworks will succeed on its claim that its aqua paint color is protectible trade dress, contributing strongly to the total image of its product, which was infringed by defendants.

### 7.   **The Public Interest**:

The legislative history of the Lanham Act, as cited in **Truck Equipment**, *supra*, points up the public interest in this matter:

> Trade-marks . . . are the essence of competition, because they make possible a choice between competing articles by enabling the buyer to distinguish one from the other.  Trade-marks encourage the maintenance of quality by securing to the producer the benefit of the good reputation which excellence creates.  To protect trade-marks, therefore, is to protect the public from deceit, to foster fair competition, and to secure to the business community the advantages of reputation and good will by preventing their diversion from those who have created them to those who have not.

**536 F.2d at 1215** (citation omitted).

It is for these reasons, so succinctly stated, that the Court

finds the public interest would be served by the grant of preliminary injunctive relief in this matter.

8. Having concluded that the **Dataphase** factors weigh in favor of granting preliminary injunctive relief, the Court now turns to the form that relief should take. Rotoworks furnished the Court with a precedent for a preliminary injunction which would include the following forms of injunctive relief:

(a) prohibiting defendants from making or selling equipment which imitates the Rotowiper product line;

(b) prohibiting defendants from selling their remaining Rotowipers;

(c) prohibiting defendants from marketing activities which use the Rotowiper trademark, logo, or aqua trade dress;

(d) prohibiting defendants from destroying or selling equipment which imitates the Rotowiper product line until Rotoworks has had an opportunity to inspect defendants' manufacturing facility during discovery;

(e) prohibiting defendants from destroying or concealing documentary evidence related to the manufacture or sale of their Arkansas-made weed wipers until Rotoworks has had a chance to complete discovery.

The Court believes that the first of these prohibitions is overly broad, in that Rotoworks does not hold a patent on weed wipers, and therefore cannot prevent competitors from making and

-17-

selling them.  However, to the extent that defendants use aqua paint to make their weed wipers appear to be Rotowipers, the Court finds that the injunction should be granted, and the use of aqua paint on competing Arkansas-made weed wipers should be prohibited at this stage of the case.

The second of these prohibitions is overly harsh, in that it would force defendants to hold on to an inventory of some 55 Rotowipers indefinitely.  While the Court is cognizant that this is essentially what defendants have been doing for the past year, the Court believes that equity requires a different result.  The Court will, therefore, prohibit defendants from selling their existing inventory of Rotowipers only on the condition that Rotoworks repurchase them for the price paid by defendants, less ten per cent per annum to account for depreciation on the units, and less the cost of shipping the units back to New Zealand.  If Rotoworks elects to repurchase the Rotowipers, the transaction is to be completed within thirty (30) days.  If Rotoworks does not elect to repurchase the Rotowipers, defendants may sell them, but may not represent that they are authorized Rotowiper dealers, and may not use any Rotoworks or Rotowiper advertising materials, including Rotowiper brochures and the rotowiper.com website, to effect the sales.

The third prohibition will be granted in full.

The fourth prohibition will be granted, with the provision

that Rotoworks may inspect and photograph equipment which imitates the Rotowiper product line at defendants' manufacturing facility during the next thirty days, after which defendants may begin selling their equipment, so long as it does not violate any other prohibition in this Order.  This prohibition does not apply to equipment made after the date of this Order which does not in any way violate the terms of this Order.

The fifth prohibition will be granted in full.

9.   The Court next takes up for consideration the matter of bond, which is required pursuant to **F.R.C.P. 65**, to secure "the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained."  The Court finds that a bond in the sum of $5,000.00 will adequately protect defendants, given that the prohibitions herein ordered will inhibit their business only by preventing them from selling existing units for thirty (30) days, and preventing them from painting their weed wipers aqua.  Indeed, the Court recognizes a very real possibility that defendants may benefit by reselling their inventory of Rotowipers to Rotoworks, given that their marketing efforts have been focused on their own product for the past two years.

**IT IS THEREFORE ORDERED** that plaintiff's **Motion For Preliminary Injunction** (document #3) is **granted.**

**IT IS FURTHER ORDERED** that, unless and until this injunction

-19-

is dissolved by Court order, defendants cease painting their Arkansas-made weed wipers aqua.

**IT IS FURTHER ORDERED** that Rotoworks may elect to repurchase from defendants their existing inventory of Rotowipers, at the price paid for the units by defendants, less ten per cent per annum to account for depreciation on the units, and less the cost of shipping the units back to New Zealand.  If Rotoworks elects to repurchase the Rotowipers, the transaction is to be completed within thirty (30) days. If Rotoworks does not elect to repurchase the Rotowipers, defendants may sell them to other purchasers, but may not represent that they are authorized Rotowiper dealers, and may not use any Rotoworks or Rotowiper advertising materials, including Rotowiper brochures and the rotowiper.com website, to effect the sales.

**IT IS FURTHER ORDERED** that defendants are prohibited from conducting any marketing activities which use the Rotowiper trademark, logo, website, or aqua trade dress.

**IT IS FURTHER ORDERED** that defendants are prohibited from destroying or selling any equipment currently in their possession or control which imitates the Rotowiper product line until Rotoworks has had thirty days to inspect and photograph defendants' manufacturing facility and inventory as a part of discovery.  This thirty-day period is to commence on the day after this Order is entered, and defendants are to cooperate fully in

-20-

allowing Rotoworks access to their facilities and inventory.

**IT IS FURTHER ORDERED** that defendants are prohibited from destroying or concealing documentary evidence related to the manufacture or sale of their Arkansas-made weed wipers until the trial of this matter and any related appeals are concluded.

**IT IS FURTHER ORDERED** that Rotoworks post a bond in the sum of Five Thousand and no/100 Dollars with the Clerk of Court, same to stand good for any damages that might accrue to defendants if this injunction should prove to have been granted in error.

**IT IS SO ORDERED,** this 5th day of March, 2007.

　　　　　　　　　　　　　　　　**/s/ Jimm Larry Hendren**
　　　　　　　　　　　　　　**JIMM LARRY HENDREN**
　　　　　　　　　　　　　　**UNITED STATES DISTRICT JUDGE**