IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

ROTOWORKS INTERNATIONAL LIMITED                    PLAINTIFF

　　　　　v.　　　　　Civil No. 07-5009

GRASSWORKS USA, LLC;
GRASSWORKS!!! L.L.C.;
ROBERT D. UMBERSON a/k/a/BOBBY
UMBERSON; and LINDA K. REED                         DEFENDANTS

<u>O R D E R</u>

Now on this 4th day of September, 2007, come on for consideration the following motions:

　　　*　**Plaintiff's Motion For Rule 11 Sanctions** (document #77);

　　　*　**Plaintiff's Motion For Extension Of Time To Respond To Defendants' Second Set Of Interrogatories And Requests For Production Of Documents** (document #85); and

　　　*　defendants' **Motion For Leave To File Sur Replies And For Extension Of Time** (document #88);

and from said motions, the responses thereto, and the supporting documentation, the Court finds and orders as follows:

1. In its Amended Complaint, plaintiff Rotoworks International Limited ("Rotoworks") alleges that defendants are liable to it for trademark infringement by counterfeiting and implied passing off, in violation of **15 U.S.C. §1114(1)**, and for trade dress and trademark infringement, in violation of **15 U.S.C. §1125(a)**.

Plaintiff also alleges that defendants' use of the website

www.rotowiper.com (the "Website") to solicit customers for its knock-off products violates the Anticybersquatting Consumer Protection Act, **15 U.S.C. §1125(d)**, and seeks injunctive relief in the form of transfer of ownership of rotowiper.com (the "Domain Name") and removal of all references to the Rotowiper product from the sales literature and the website of the defendants.

The Amended Complaint prays for an extension of the preliminary injunction entered on March 5, 2007, to defendant Metal Works, L.L.C.; for permanent injunctive relief; for damages, attorney's fees and costs; for "divestiture" of the Domain Name; for removal of all references to Rotowiper products from defendants' product literature and grassworks.net website; and for destruction of all knock-off products manufactured by defendants.

Defendants have filed a Counterclaim alleging that Rotoworks and its agents have tortiously interfered with their contracts and prospective business expectancies.

2.   The motions now under consideration all relate to the Counterclaim.   Plaintiff contends that the Counterclaim was interposed for an improper purpose, and that it should not have to answer discovery requests addressed to the Counterclaim until this Court has resolved its **Rule 11** motion.

3.   **F.R.C.P. 11(b)** provides that the filing of a pleading constitutes certification by the attorney that, to the best of his knowledge, information, and belief, "formed after an inquiry

reasonable under the circumstances,"

> * the pleading is not presented "for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation";

> * the claims are warranted by existing law or a nonfrivolous argument for a change in existing law; and

> * the factual allegations have evidentiary support, or -- if specifically so identified -- are likely to have evidentiary support, given a reasonable opportunity for discovery.

In evaluating a motion for sanctions under **Rule 11,** the Court applies a standard of "objective reasonableness." **Isakson v. First National Bank, Sioux Falls**, **985 F.2d 984 (8th Cir. 1993)**.[1]

4. Defendants interposed their Counterclaim on May 29, 2007. In it, they make the following assertions:

> * that plaintiff has "utilized the claims asserted in the original Complaint as a means to tortiously interfere with the contracts and prospective business expectancies of Counterplaintiffs";

> * that plaintiff has "attempted to use the discovery process as a self-help remedy and vehicle of retaliation against Counterplaintiffs so that Counterplaintiffs

---

[1]Rule 11 also contains a "safe harbor" provision requiring the movant to serve a motion for Rule 11 sanctions on the party from whom such sanctions are sought, and give that party 21 days to withdraw the challenged pleading before filing the motion with the Court. There is no dispute that plaintiff complied with this provision.

-3-

would be monetarily injured regardless of the success of Rotoworks' claims for trademark infringement and trade dress infringement";

* that plaintiff "did not send a cease and desist letter to Counterplaintiffs before filing suit";

* that plaintiff "did not terminate the stipulated authority of Defendants Umberson and Grassworks USA to advertise, market, offer and sell Rotowiper products prior to the filing of the original Complaint";

* that plaintiff "has not negotiated in good faith to settle all outstanding claims once suit had been brought despite bona fide offers from Counterplaintiffs";

* that plaintiff has "forced Counterplaintiffs to incur substantial legal fees to protect their confidential information and to defend trademark claims that ultimately will be deemed invalid";

* that "[u]pon information and belief, Rotoworks agents have caused valuable, confidential information of Counterplaintiffs to be disclosed to and used by Rotoworks for unfair competition against Counterplaintiffs";

* that plaintiff has "used telephone records of Counterplaintiffs and also of Michelle Thomas, who is not a party to this suit, to make random harassment

-4-

calls to third parties";

*   that plaintiff "has called not only customers but also other persons who are completely unrelated to the sale or offer of sale by Counterplaintiffs of herbicide applicators";

*   that plaintiff "has contacted a party to ask questions about this case, although the party's only association with any party in this suit was that it had sold sheep to Bobby Umberson and Michelle Thomas";

*   that plaintiff "contacted an employee of Defendants and asked him about the 'Rotowiper' he had purchased, although he had never purchased a herbicide applicator";

*   that "[m]any of these persons being contacted by Rotoworks who are not currently customers do represent prospective future customers of Counterplaintiffs, and Rotoworks is damaging the prospective business expectancy from these persons";

*   that plaintiff is using the "confidential phone records, bank records and other confidential business and customer information as part of a 'fishing expedition' to compete unfairly with Counterplaintiffs and try to destroy the reputations and businesses of Counterplaintiffs"; and

*   that plaintiff "is trying to tarnish the reputation of

Counterplaintiffs in the community and to cause third parties to cease doing business with Counterplaintiffs."

As a remedy for these alleged wrongs, the defendants pray for $1,000,000 in damages and "permanent injunctive relief requiring the immediate return of all confidential information of Counterplaintiffs." They also ask the Court to prohibit Rotoworks "from the use or disclosure of such information and from the contacting of any customers or acquaintances of Counterplaintiffs."

5. Tortious interference with contracts and business expectancies is a common law cause of action as to which Arkansas state law supplies the rule of decision. **Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938).** In order to prevail on the cause of action, the defendants would have to prove four elements:

* the existence of a valid contractual relationship or business expectancy;

* knowledge on the part of the plaintiff of such contractual relationship or business expectancy;

* intentional interference causing a breach of the contract or a termination of the business expectancy; and

* resultant damage.

**Alvarado v. St. Mary-Rogers Memorial Hospital, Inc., --- Ark. App. ---, --- S.W.3d ---, 2007 WL 1490941 (2007).**

-6-

It must also be proven that any interference, to be actionable, was improper. **Fisher v. Jones**, **311 Ark. 450, 844 S.W.2d 954 (1993).** In determining whether interference was improper, the Court considers the following factors:

* the nature of Rotoworks' conduct;

* Rotoworks' motive;

* the interests of the defendants with which the conduct of Rotoworks allegedly interfered;

* the interests sought to be advanced by Rotoworks;

* the social interests in protecting the freedom of action of Rotoworks, and the contractual or business interests of the defendants;

* the proximity of Rotoworks' conduct to the alleged interference; and

* the relations between the parties.

**Fisher**, **311 Ark. at 459, 844 S.W.2d at 959.**

6. As can be seen from the foregoing, the fulcrum for decision of the **Rule 11** issue is the question of propriety, both with respect to **Rule 11** itself, and with respect to the cause of action alleged in the Counterclaim. Under **Rule 11**, a pleading must not be presented "for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation." Under Arkansas law, any interference with contract or business expectancy, to be actionable, must be improper.

-7-

The Court has conducted a rather extensive review of the history of this case, and the factual submissions of the parties, and is persuaded that the Counterclaim was interposed for an improper purpose or purposes, and further, that any interference Rotoworks may have caused with defendants' contracts or business expectancies was not improper.

7.    The allegations of the Counterclaim all have to do with Rotoworks' conduct in connection with the pending litigation:

*    that it brought suit without warning the defendants;

*    that has used information obtained through discovery to locate witnesses;

*    that it has not settled the matter; and

*    that the suit is costing defendants a lot of money to defend.

There is, of course, no legal requirement that a plaintiff notify a prospective defendant of the intent to file suit, nor any requirement that the parties settle.  Nor is the simple fact that filing of a lawsuit imposes defense costs on the defendants actionable.  In responding to the Motion For Sanctions, defendants do not even argue that these allegations might in some way justify the filing of the Counterclaim, and the Court will not further address them.  The focus of the Counterclaim, the pending motions, and this Court's analysis, is on the use made, or allegedly made, by plaintiff of information learned during discovery.

-8-

8.   Early in the discovery process, plaintiff took steps to obtain the telephone records and bank records of the defendants, both by serving subpoenas on third parties and by propounding written discovery to the defendants.   Defendants resisted the discovery of this information vigorously but unsuccessfully, and obviously feel very aggrieved that the information was obtained by the plaintiff.

A review of the relevant docket entries reflects defendants' dissatisfaction, and their unwillingness to accept the Court's rulings on the issues, as well as their inability to come forward with evidence to support their position as to the discovered information:

*      On March 5, 2007, the Court granted preliminary injunctive relief to Rotoworks.  As part of its Order, it directed defendants to "cooperate fully" in allowing Rotoworks to inspect and photograph their manufacturing facility and inventory.  A date was scheduled for inspection, but when that date came, defendants insisted upon an "attorney's eyes only" agreement that would prevent Rotoworks' counsel from disclosing information gained in the inspection to their client.  When Rotoworks' counsel refused to enter such an agreement, the inspection was denied.  This situation resulted in Rotoworks filing its first Motion To Compel, on March

20, 2007.

* Defendants urged the Court to deny the Motion To Compel, asserting that what was inside the facility amounted to "trade secrets and confidential and proprietary information of Defendants."

* On April 4, 2007, the Court entered an Order allowing Rotoworks' attorneys, and its investigator Steve Mankin ("Mankin") to enter the facility and photograph all of its contents in plain view, but prohibiting them from opening drawers or inspecting the contents of closed containers.

* On March 27, 2007, defendants filed their first Motion For Protective Order, asking for "limitations" on the use plaintiff could make of information sought via certain subpoenas for their telephone records.[2] Defendants argued that the telephone records amounted to "confidential, proprietary information and trade secrets within the meaning of" **A.C.A. §4-75-601(4)**. They also contended that Rotoworks "appears to be using discovery as a retaliatory remedy than as an efficient tool to discover the necessary facts to try the case," and "wants the ability to use the confidential personal, private and commercial information of Defendants for any

---

[2]Defendants also filed a motion to quash the subpoenas, which was denied.

-10-

purpose it sees fit."  Defendants wanted all telephone records and business records made subject to an "attorney's eyes only" limitation, and wanted to limit plaintiff's contact with witnesses to the scheduling and taking of depositions.

*   On April 11, 2007, the Court denied the Motion For Protective Order, finding that defendants had failed to show the telephone records were trade secrets, and further finding, upon *in camera* examination of the records, that they did not merit protection under **F.R.C.P. 26(c)**.  The Court also found that defendants had failed to show that disclosure of the records would be harmful to their interests, and it refused to "assume that plaintiff intends to act in bad faith or otherwise misuse these records."

*   Defendants immediately moved for reconsideration.  They supported this motion with the Declaration of Bobby Umberson, in which Umberson averred that Rotoworks would use the telephone records to "taint any testimony by customers who are potential witnesses in this case by intimidating them into agreeing with the claims of Plaintiff because they are afraid of getting involved in a lawsuit"; that "there is a high probability that [Rotoworks] will destroy my business by making biased

-11-

comments to potential witnesses in the community"; and
that "[i]t is clear that Plaintiff, Plaintiff's
attorneys and their private investigator are on a slash
and burn vendetta against me personally to retaliate for
my competition with Plaintiff, and that now they are
attempting to use the discovery process of this court
proceeding as a front to retaliate against me on the
streets of Lincoln, Arkansas."  Defendant Linda Reed,
and Umberson's business associate Michelle Thomas
(principal of defendant Grassworks!!! L.L.C.), offered
similar -- although less hyperbolic -- Declarations.

* On April 25, 2007, the Court denied defendants' Motion
For Reconsideration, finding both their arguments and
their evidence unpersuasive.  Not only did the Court
find no basis to prevent discovery of the telephone
records, it specifically noted with regard to
defendants' request to limit Rotoworks' access to the
records that, "as the subject records are the legitimate
fruits of discovery and do not merit protection via
protective order, the Court finds no reasonable basis
for placing such limitations on the use of this
information."  The Court reiterated that it would "not
assume that plaintiff intends to act in bad faith or
otherwise misuse these records.  Thus, while defendants

speculate that plaintiff will use the subpoenaed records to bias potential witnesses and retaliate against defendants, such unsupported contentions do not establish that the disclosure of these records will be harmful to defendants' interests in the information contained therein."

* Within an hour of entry of the April 25 Order, defendants filed yet another Motion For Protective Order. This motion did not address the telephone records, focusing instead on information sought in Plaintiff's First Interrogatories and Requests for Production of Documents, including customer lists, e-mail traffic, and financial information relating both to defendants' sale of Rotowipers, and to their other business interests. Defendants argued that the reasons given for the discovery requests were "mere pretext for Rotoworks to gain information that it can destroy Defendants' business interests in retaliation for its competition with Rotoworks." Defendants asked the Court to limit disclosure of any such information to counsel only, and to prohibit any contact with defendants' customers other than to arrange for and take depositions of them. This motion was supported by the same Declarations of Umberson, Reed, and Thomas as the Motion

-13-

For Reconsideration.  The accompanying brief opened by accusing Rotoworks of "engag[ing] in a full-scale attack upon Defendants . . . and all business assets they own." The brief went on to argue that the information sought qualified as trade secrets under **A.C.A. §4-75-601,** and to assert that "[i]f Rotoworks is allowed free access and use of this information, it is likely that Rotoworks and its attorneys and their agents will use the information to steal customers of Defendants or to tarnish Defendants' reputation in the community and damage Defendants' business interests and ability to compete as part of Rotoworks' ongoing efforts to retaliate against Defendants."  Defendants contended that "[i]t is clear that Rotoworks and its attorneys have no real need for the Unrelated Confidential Information they are requesting *except* (1) to engage in a wholesale fishing expedition for discovery, (2) to run up legal fees for themselves and Defendants and (3) to harass and retaliate against Defendants for their past competitive activities."  They argued that "[i]n no event should Plaintiff Rotoworks itself be permitted access to Defendants' customer lists due to the unfair competition and irreparable harm that would result to Defendants."  Attorney use of the information, they

argued, should be limited to scheduling and taking depositions.

* On May 8, 2007, the Court denied defendants' Second Motion For Protective Order. Although noting that the motion was untimely, and that defendants had been uncooperative in the discovery process, the Court did not deny the motion on that basis alone. It addressed the substantive merits of the motion and found them lacking. It found that defendants had failed to show that the requested information amounted to protectable trade secrets, or that disclosure of the information would be harmful to their interests, and refused yet again to "speculate" that Rotoworks would act in bad faith or abuse the discovery process.

All of the foregoing legal skirmishing took place before defendants filed their Counterclaim. Thus the Court had ruled -- three times, unequivocally -- that defendants had failed to show that any of the information requested in discovery, or from third parties, amounted to trade secrets or was entitled to protection under **F.R.C.P. 26(c)**. It had also considered defendants' repeated assertions that Rotoworks would misuse the information to their detriment, and found no evidence that such would occur. Neither defendants nor their attorney had come forward with any factual basis to support their contentions that the information was

-15-

confidential, or that Rotoworks would misuse it.  If they had had such information, the Court believes they would have presented it in connection with the motions discussed above.  It was in this legal posture and evidentiary context that defendants filed the Counterclaim.

9.  Events subsequent to the filing of the Counterclaim confirm the Court's finding that defendants had no factual support for the Counterclaim.  Umberson was deposed on June 20, 2007.  He described the manufacturing facility for which he had claimed "attorney's eyes only" protection as a "rather ordinary" place where he manufactured ordinary, nonpatented stuff.  As for the customer information he claimed to be a trade secret, he testified that he rarely contacted past customers, because they already had a weed wiper and not many of them would need a second one.  He did not recontact "old potential sales," and usually did not even follow up with people who requested information, other than to send them literature.

When asked for all facts he knew of which would support the Counterclaim, Umberson knew of only four calls by Mankin:  one to an employee (who he admitted was "continually talking about how good our units are and how good they'll work" and had not stopped doing so); one to "a gentleman in Texas" (who "confirmed his support" for Umberson); one to the father of Umberson's business associate, Michelle Thomas; and one described as "Linda got a call

-16-

that we're suspicious of."  In spite of the continued support shown by those he knew had been contacted, he testified that these calls led him to wonder "how many other people have [sic] Mr. Mankin browbeat and -- and got them where they're just going to crawl in a hole and not do anything?"  He also testified that "[i]f he keeps . . . getting in touch with my -- my past customers, it will affect my future customers, because word-of-mouth sales are very good sales."  He did not know of anything negative that any of those accused in the Counterclaim had said about him, but stated that "I don't know what you're capable of."

When asked how Rotoworks was engaging in unfair competition, Umberson testified that its website now says they "have a super importer that is just full of service . . . implying that I was inadequate service [sic]."

Umberson had no information that he was being damaged, or that Rotoworks (as opposed to Rotoworks' attorneys and investigator) had received any of the information discovered in this lawsuit.  He testified "I have none, other than the fact that you have clearly stated that you can give it to him [Neil Barker, principal of Rotoworks].  So I'm assuming that you have given it to him.  So I'm assuming that Neil Barker has given it to Rafe Essary [Rotoworks' new U.S. distributor]. And I'm assuming that damages are being done."  He also testified that "there could be damages.  How much, I don't have any idea.   It could be

substantial.  It depends on how far you and your people want to go.  Right now I don't know that you're stopping at anything."

When asked how he arrived at the sum of $1,000,000 as damages on the Counterclaim, Umberson testified "[b]ecause I have no idea how long the ongoing effects of this is going to have, because your folks have my phone records.  Your folks have my invoices.  Your folks have everything of mine. . . . you can reach out and affect a million dollars worth of potential sales very easily."

Linda Reed was asked how Rotoworks has used her "confidential information," and responded "I don't know that they have yet.  But if they have it, I don't know if they can -- if they would."  She thought the subpoenas "put a red flag up" to their banks and vendors.

Reed  had even less knowledge of any "harassing" phone calls to customers than did Umberson.  The "suspicious" call referred to by Umberson was described by Reed as follows:  "I received a phone call from somebody in this area that, when I answered, didn't talk to me."  She hit dial return, and "then it comes up, 'this number is unknown'," and she "automatically assumed it was Mankin." She also thought it was "a pretty good assumption" that Mankin had called everyone listed in her phone records.

Reed had heard about the call to the Texas gentleman, and thought there had been a harassing call made to Umberson, although

-18-

Umberson did not mention such a call in his deposition.

Reed acknowledged that she could not prove anything with regard to specific future customers, and that "you can't call them future customers 'cause we really -- none of us know who future customers are." Like Umberson, she related unfair competition by Rotoworks to the content of its website -- to the effect that the company now has "a new and better" U.S. distributor -- which she described as "demeaning us; that we weren't good."

When asked whether Rotoworks or its new U.S. distributor were misusing her "confidential information," Reed only offered vague speculation such as "they could," and "I have no reason to believe they haven't." She had no information that Rotoworks had done anything that would affect any future customer of defendants, but had concerns that the calls would lead customers to tell their neighbors "'that Weed Wiper is under legalities or whatever.' It's just giving us a black eye."

Michelle Thomas, principal of defendant Grassworks!!! L.L.C., had even less to go on in asserting the Counterclaim than Umberson or Reed, complaining only that Umberson had been "absent more the past six months" because of his involvement in the lawsuit and needing to be at more trade shows to earn money for legal fees, which had caused her a hardship in conducting her business.

The only use of telephone numbers of which Thomas was aware was that her father had been "contacted by someone, asking if he

had any knowledge or if he had any referrals concerning Rotowipers." She had no information suggesting that this call was harassing in nature, although her father was upset by it because "[h]e's very angry about my involvement in this lawsuit."

The deposition testimony of Umberson, Reed, and Thomas indicates that even in mid-June -- some three weeks after the Counterclaim was filed -- the defendants had nothing more than speculation upon which to base their assertion that they were entitled to $1,000,000 in damages for the use by Rotoworks of information it had legitimately obtained through discovery and investigation. They could, thus, have had no such information at the time the Counterclaim was filed -- nor could their attorney -- and it was not objectively reasonable for them to file the Counterclaim under those circumstances.

10.  The utter lack of a factual basis for the Counterclaim creates a strong inference that it was filed for some purpose other than to assert a right to a remedy warranted by the law and the evidence, and, therefore, for an improper purpose. The prayer of the Counterclaim points that inference toward the conclusion that the purpose of the Counterclaim was to harass and intimidate Rotoworks, stifle use of discovered information, and ultimately delay resolution of this case. Without any evidentiary support to back it up, defendants sought damages of $1,000,000. The prospect of having to pay such a sum as the price for taking discovery --

even if remote -- might well intimidate even the most stalwart of attorneys.

In addition, the Counterclaim prays for "permanent injunctive relief requiring the immediate return of all confidential information of Counterplaintiffs," and asks the Court to prohibit Rotoworks "from the use or disclosure of such information and from the contacting of any customers or acquaintances of Counterplaintiffs." This is clearly relief aimed at stopping the discovery process, and -- just as clearly -- it is relief which had already been denied by this Court on multiple occasions.

The foregoing facts lead the Court to conclude that the Counterclaim was presented for an improper purpose, thus violating **Rule 11.**

11.  The conduct of defendants' attorney likewise indicates an intention to use the Counterclaim -- and other assertions of "confidentiality" -- to intimidate Rotoworks and its counsel. About 30 pages into Umberson's deposition, after an exchange of the most mundane information, defendants' attorney suddenly informed plaintiff's counsel that he was "going to designate this deposition and the deposition of Ms. Reed and Ms. Thomas as confidential." The depositions of Reed and Thomas had already been taken, and -- like that of Umberson -- they contained nothing that could reasonably be claimed as confidential. This is especially true given the Court's repeated rulings on the issue.

When Rotoworks' attorney questioned defense counsel about why he was making the "confidential" designation, counsel stated "[w]e can designate something as confidential based on its got confidential information of ours.  If you don't treat it as confidential, you do so at your own peril. . . . we intend to appeal the court's order that this information is not confidential.  So at such time it is ultimately resolved on appeal, we'll deal with what the implications are."

The tenor of this exchange is such as to convince the Court that defendants and their attorney intended to intimidate plaintiff and its attorney by holding over their heads the threat of some future consequence for going forward with normal discovery and trial of this case.

12.  Defendants' arguments in response to the Motion For Rule 11 Sanctions have little merit.  They first assert that a settlement demand submitted by plaintiff on June 12, 2007, is evidence that Rotoworks is "seeking to run Defendants out of business" and "demonstrate[s] the bad faith motivations that Rotoworks has in this case."  The settlement offer asks for a cash payment funded in part by liquidation of the facility where defendants manufacture weed wipers, and for an agreement to refrain from manufacturing or selling weed wipers for ten years.

The Court is not persuaded that this settlement offer justifies the Counterclaim, for three reasons.  First, it was made

-22-

after the Counterclaim was filed.  Second, it only seeks to prevent defendants from operating their weed wiper business, and has nothing to do with the various other businesses they operate. Third, the settlement offer was just that, an offer.  It could be ignored, turned down, or countered, without consequence other than the non-settlement of the case.

Defendants also repeat their contention -- repeatedly rejected by this Court -- that because Rotoworks' counsel intended to share what it had learned in discovery with its client, an inference that the client "wants to use the confidential information of Defendants to destroy their businesses is not an unreasonable conclusion to reach from these facts."  The argument that a party *will* do anything it *can* do is mere speculation, probative of nothing.  While nonlawyers such as the defendants might be forgiven for indulging it (at least they might forgiven if the Court had not ruled to the contrary so many times), an attorney of long experience, such as defendants' counsel, certainly knows better.

Defendants also suggest that their Counterclaim might be supported because Umberson "thought" he saw plaintiff's attorneys drive by his manufacturing facility, and "thought" he saw them in Lincoln, Arkansas.  They suggest that it might be justified because Umberson was concerned that if someone had his bank records, and a video of "what's going out the door and being

-23-

shipped out" and "a matching production cycle" with "a window of purchases" they could "figure out our cost of production pretty easy." Again, these contentions are based on mere speculation, and do not justify the Counterclaim.

Defendants also contend that the Affidavit of Steve Mankin supports their Counterclaim. That Affidavit -- like the settlement letter -- postdates the filing of the Counterclaim and thus could not have justified it. The Affidavit also does not provide any factual support for the Counterclaim. In it, Mankin avers that he did not "randomly" call phone numbers from defendants' telephone records, but rather attempted (by comparing the phone records with other documents produced in discovery) to determine which phone numbers were likely to reach people who would be appropriate witnesses in this case, such as "persons who wrote a check or email requesting a genuine Rotowiper unit but whose invoice listed a GrassWorks Weed Wiper or other product name that indicated a domestic unit was being switched out for a genuine Rotowiper unit."

Mankin averred that he had made some 74 calls to selected persons, in which he "maintained a professional demeanor," was "not harassing or threatening," and did not make "disparaging statements about Defendants or their products." Mankin recorded the calls, and the recordings have been provided to the defendants.

-24-

The transcripts of three of Mankin's phone calls are made exhibits to Defendants' Response To Plaintiff's Motion For Rule 11 Sanctions.  Those transcripts do not indicate that Mankin did anything that would prejudice any witness, or that would prejudice defendants.  He did not inform his contacts that there was a lawsuit, or indicate any partisanship in the matter.

Defendants also argue that the Counterclaim is "a compulsory counterclaim that had to be asserted or it would be waived."  **F.R.C.P. 13(a)** provides that "[a] pleading must state as a counterclaim any claim that -- at the time of its service -- the pleader has against an opposing party if the claim: (A) arises out of the transaction or occurrence that is the subject matter of the opposing party's claim."  It would require a contorted -- and in the Court's view totally unjustified -- reading of this Rule to find that it requires the filing of a counterclaim any time a party feels -- rightly or wrongly -- that discovery is being abused.  Discovery "arises out of" the conduct of the lawsuit itself, not the transaction or occurrence that led to the filing of the lawsuit.

13.  Taking all of the foregoing into consideration, the Court concludes that neither the defendants nor their attorney, at the time of filing the Counterclaim, had a factual basis -- or a reasonable expectation of discovering a factual basis -- to assert that Rotoworks or its agents were interfering with any contractual

relationship or business expectancy on the part of defendants. The Court also concludes that the conduct alleged to have taken place -- that of Rotoworks' investigator contacting witnesses using the discovered telephone records -- was not wrongful interference even if it should ultimately be found to be interference, because it was a legitimate use of discovery and investigation to prepare for trial of this case.

In addition to the fact that the Counterclaim was not supported by the law or the evidence when it was filed (nor thereafter), the Court also finds that it was filed for improper purposes, i.e., to harass and intimidate plaintiff and its attorneys; to interfere with discovery; to seek to circumvent the Court's multiple rulings concerning discovery; and to delay the resolution of this case.

These findings lead inevitably to the conclusion that defendants and their attorney have violated **Rule 11.**

14. Having found that **Rule 11** was violated, the Court takes up the issue of what sanctions are appropriate for such violation. It is readily apparent from the foregoing analysis that the Counterclaim should be stricken and the Court will so order. Accordingly, plaintiffs will not be required to respond to defendants' discovery requests, insofar as they are related solely to the Counterclaim, and not to the issues raised by the Amended Complaint and the Answer in this case.

The Court also finds it appropriate to require defendants to pay the attorney's fees and costs incurred by plaintiff in addressing the Counterclaim and it will so order.

In addition to these sanctions, the Court is obliged to consider whether it should impose a separate monetary sanction on defendants' counsel for the continued assertion of claims which this Court has repeatedly rejected.   Counsel's conduct has required the unnecessary expenditure of time not only by plaintiff, but also by the Court.   When a ruling on an issue has been made, counsel and the litigants they represent are expected to accept that ruling and conduct the case in light of that ruling -- regardless of whether they agree with it.   If they disagree with a ruling, their remedy is by appeal, and not -- as happened in this case -- by threatening the opposing party with some unspecified consequence should that party follow the Court's rulings and those rulings later be reversed on appeal.

The Court believes that defense counsel, Gary Speed, as an experienced attorney, is aware of these guidelines, and that he has flouted them in this case.   For this reason, the Court finds that a monetary sanction of $1,000.00 should be imposed on Mr. Speed personally, to be paid by him and not by his clients.   This sanction is to be paid into the Registry of the Court, rather than to plaintiff.

15.  Finally, the Court expresses its displeasure with the

unprofessional bickering the parties and their counsel have continually engaged in with regard to discovery in this matter. The Court's review of the depositions submitted in support of the various motions, and the letters and e-mails of the attorneys to one another, reminds it of a playground dispute and does not reflect favorably on the participants.  While the emotional and unnecessarily disputatious conduct of non-lawyer parties can, perhaps, be  understood, the Court expects better of the attorneys and neither understands nor condones such behavior on their part. The Court expects these professionals to conduct themselves as such, and to focus on the resolution of genuine issues, rather than using this Court as an arena to air their personal disputes.

**IT IS THEREFORE ORDERED** that **Plaintiff's Motion For Rule 11 Sanctions** (document #77) is **granted**, and the following sanctions are imposed on defendants for violation of that Rule:

* defendants' Counterclaim is hereby stricken and held for naught, and plaintiff need make no response thereto;

* to the extent that any discovery propounded by defendants to plaintiff relates solely to the issues raised by the Counterclaim, plaintiff is not required to further respond thereto;

* plaintiff is entitled to an award of its reasonable attorney's fees and costs incurred in responding to the Counterclaim and preparing the Motion For Rule 11

-28-

Sanctions, and is directed to file documentation of those expenses within fourteen (14) days of this Order; defendants will be allowed ten (10) days thereafter to file any objections they may have to such documentation;

\* defendant's attorney, Gary Speed, is assessed a sanction of One Thousand Dollars ($1,000.00), to be paid by him personally and not by his clients, into the Registry of the Court.

**IT IS FURTHER ORDERED** that **Plaintiff's Motion For Extension Of Time To Respond To Defendants' Second Set Of Interrogatories And Requests For Production Of Documents** (document #85) is **granted.** To the extent these Interrogatories and Requests for Production of Documents relate solely to the Counterclaim, no response will be required of plaintiff. To the extent they relate to the issues raised by the Amended Complaint or the Answer, responses thereto will be deemed timely if made within fourteen (14) days of the date of this Order.

**IT IS FURTHER ORDERED** that defendants' **Motion For Leave To File Sur Replies And For Extension Of Time** (document #88) is **denied.**

**IT IS SO ORDERED.**

        /s/ Jimm Larry Hendren
**JIMM LARRY HENDREN**
**UNITED STATES DISTRICT JUDGE**

-29-